## UNITED STATES DISTRICT COURT
## DISTICT OF MASSACHUSETTS

MALAIPERUMA
SUNDARAMURTHY,
Plaintiff,

v.                                                    Civil Action No. 4:21-40055-MRG

ABBOTT VASCULAR, INC.,
Defendant.

## MEMORANDUM & ORDER ON DEFENDANT ABBOTT VASCULAR INC.'S MOTION FOR SUMMARY JUDGMENT [ECF No. 65]

**GUZMAN, D.J.**

### I.   INTRODUCTION

This is a products liability case involving a medical device.  Plaintiff-patient alleges that Defendant-medical device company's coronary stent graft product contained a manufacturing defect that harmed him during an emergency medical procedure performed in the wake of a heart attack.  After Counts II and III were dismissed in a prior order, Defendant moved for summary judgment on Plaintiff's sole remaining claim in the case: Count I, negligence on a manufacturing defect theory under Massachusetts law.  Defendant argues that Plaintiff's failure to designate any expert as to the alleged defect and/or causation mandates summary judgment in its favor and that, in any event, there is no genuine dispute as to any material fact indicating an alleged defect.

This Court agrees with Defendant.  Expert evidence was an absolute must here and summary judgment must enter on that basis alone.  Further, this Court rejects

1

Plaintiff's eleventh-hour attempt to recast his claim under a theory *res ipsa loquitur*. After careful consideration and for the reasons stated below, in April 2025, the Court **GRANTED** Defendant's summary judgment motion by electronic order. [ECF No. 97]. This Memorandum and Order provides the Court's factual findings and legal analysis that support the grant of summary judgment.

## II.    BACKGROUND

### a.    The Facts[1]

#### i.    Plaintiff's Heart Attack and Initial Medical Procedure

On June 24, 2018, Plaintiff experienced a heart attack[2] and sought treatment at St. Vincent's Hospital in Worcester, Massachusetts. [ECF No. 95 at 1–2]. His treating physician began by conducting a catheterization, which is essentially an "inspection of [Plaintiff's] arteries" during which doctors can "intervene[]" with a certain artery or arteries as needed. [ECF No. 70-2 at 38]. During this procedure, Plaintiff was in the hospital's cardiac catheterization "lab" and was partially sedated. [Id.] It soon became "obvious" to his treating physician which artery was the "culprit" responsible for the myocardial infarction episode. [Id.] Specifically, the doctor determined during the catheterization that Plaintiff's "circumflex artery was subtotally occluded or functionally occluded" and decided that he needed to a perform a "procedure . . . to reopen that artery . . . ." [Id. at 37–38] The doctor estimated that

---

[1] Unless otherwise noted, the following facts are undisputed.

[2] Technically and in the words of his treating physician, Plaintiff was experiencing a "myocardial infarction."   [ECF No. 70-2 at 38].

it took about twenty to thirty minutes from the beginning of the procedure to determine that some form of intervention was necessary. [Id. at 39]

The intervention began with the use of a balloon to open up the artery in distress. [Id. at 40] After the artery was "ballooned," the treating physician eventually inserted three stents into the problematic artery. [Id. at 41]. A post-insertion inspection, or, in technical terms a "post intervention angiograph," showed evidence of a "perforation"[3] in the Plaintiff's artery. [Id. at 49–53].

### ii. Use of the GraftMaster

In response to presence of the perforation, the treating physician decided to use a GraftMaster device. [Id. at 53].[4,5,6] Specifically, he chose to use this device because if he was able to "advance [the GraftMaster] to the area that had the

---

[3] In this context, "perforation" means, "[a] hole, such as an ulcer, in an organ or tissue." *Perforation*, Harvard Health Publishing's Medical Dictionary of Health Terms, https://www.health.harvard.edu/j-through-p#P-terms.

[4] Defendant is the manufacturer of the GraftMaster. [ECF No. 66 at 3]. This device's formal name is the "Abbott GraftMaster Coronary Stent System." [ECF No. 67 at 1]. It was originally owned and manufactured by a company named Jomed AB. [Id.] In 2003, Defendant purchased two lines of Jomed AB's business. [Id.] Included in that purchase was the GraftMaster, and Defendant is now the device's registered owner with the U.S. Food and Drug Administration ("FDA"). [Id.]

[5] As Defendant has explained, the GraftMaster may be used to treat perforations in coronary arteries. [ECF No. 66 at 3]. Historically, the only treatment for this life-threatening condition was open heart surgery, and devices like the GraftMaster provide a minimally invasive alternative. [Id.]

[6] It is undisputed that Defendant played no role in the June 24, 2018 medical procedures or that it had any contact with the GraftMaster in question after it was sold and delivered to St. Vincent's Hospital. [ECF No. 92-1 at 6].

perforation, [the device] seals off the perforation and corrects the problem." [Id.][7] The doctor further testified that the GraftMaster was the "only product available" to achieve this medical objective. [Id.] The physician testified that before employing the GraftMaster, he at least visually looked at the device to ensure that it was in good working condition, although he noted that he did not perform a detailed inspection on the device since Plaintiff's medical condition was "potentially catastrophic." [Id. at 54] He confirmed that it did not appear damaged when it was removed from its packaging and appeared to be in its intended condition prior to use. [Id.]

To deploy the GraftMaster, the treating physician knew that he would have to "weave" through some of the existing stents to reach the location of the perforation. [Id. at 55] Soon after the treating physician deployed the GraftMaster into Plaintiff's body, the doctor began to "experience resistance." [Id. at 60–61]. After determining that the device could not be advanced to the perforation site, he attempted to extract it from the treatment environment. [Id. at 61–62] However, during the attempted extraction and the doctor could not safely remove it from the narrowed artery. [Id. at

---

[7] It is helpful at this juncture to briefly explain how the GraftMaster is intended to operate. As Defendant has explained and Plaintiff has not disputed,

> The GraftMaster is made up of an ultra-thin layer of expandable polytetrafluoroethylene (PTFE), sandwiched between two GraftMaster expandable stents. To treat the perforation, the deploying physician passes a wire through the artery to the site of the perforation, deploys the GraftMaster over that wire to the location of the perforation, and then expands the GraftMaster stent system with the aid of a balloon which allows the stent to cover the perforation and stop the bleeding.

[ECF No. 66 at 3].

62]  The doctor further testified that the GraftMaster was lodged "within" one of the three original stents.  [Id. at 62–63]

At this point, the treating physician decided to deploy the GraftMaster by inflating its balloon at what appeared to be a safe site within the treatment environment.  [Id. at 69 (the treating physician explaining that "there was no other maneuver, at that point in time, that I could think of to do other than deploying [the GraftMaster] in what I would consider a safe site")].  The doctor further testified that he was unable to determine if the balloon *deflated* despite multiple attempts to do so. [Id. at 71]

### iii.  The GraftMaster's Eventual Surgical Extraction

Plaintiff avers in his summary judgment briefing that he "required emergency surgery to remove the Graft[M]master balloon within the artery."  [ECF No. 92 at 1]. The treating physician explained that after the procedure described *supra* that resulted in the immobilized GraftMaster, the device was subsequently and successfully surgically extracted.  [ECF No. 70-2 at 75-76].  The doctor later told Plaintiff that as a result of his heart attack and the complication during the intervention procedure, he had experienced a "small amount of damage" but assured him that there was "no reason to think that he didn't have a very good prognosis going forward." [Id. at 76]  In his Amended Complaint, Plaintiff alleges that the harm that resulted from the procedure involving the GraftMaster has caused  adverse effects on his heart condition, decreased quality of life and medical expenses.  [ECF No. 26-2 at 3].  He further alleged that his condition is not expected to improve in the future and

that he thus anticipates further medical treatment for his blocked artery in the future.  [Id.]

### iv.  The Treating Physician's Prior Experience with and Knowledge of the GraftMaster

The treating physician stated that he had not experienced the same issues with a GraftMaster before (i.e., failure to advance it to a perforation site and then inability to extract it from the treatment environment), [ECF No. 70-2 at 77-78], although he also testified that he believed he had used the device just once before,  [id. a 25]. Notably, the treating physician acknowledged that he considered each of the following aspects of the GraftMaster to be "known risks": (1) "the stent becoming stuck," (2) "the balloon [ ] not inflat[ing]", (3) "the balloon [ ] not deflat[ing]," and (4) "an artery wall may be punctured."  [Id. at 32–33].  Further, he agreed that just because one of those risks occurs did not mean that the device was defective or that the medical professional using the device did anything wrong.  [Id. at 35–36].

### v.  Plaintiff's Allegations of the Defect

Plaintiff alleges that the manufacturing defect of the GraftMaster is that the product did not "work as designed" because it "lost its ability to deflate from the inflated state" during his procedure. [ECF No. 68-4 at 2].  Plaintiff maintains that he is "aware that that defendant had encountered problems in the past regarding manufacturing," [Id.], such as using "a manufacturing process that exposed some of these balloons to excess heat during manufacturing," [ECF No. 26-2 at 4].  In short, Plaintiff does not provide additional evidence about what the manufacturing defect

is but instead relies on general testimony that because the GraftMaster failed to deflate during his procedure, it therefore has a manufacturing defect.

### b. <u>Further Relevant Context</u>

#### i. <u>The GraftMaster's FDA Classification</u>

As the Supreme Court explained in <u>Riegel v. Medtronic, Inc.</u>, the Medical Device Amendments of 1976 ("MDA"), 21 U.S.C. § 360c *et seq*, created a regulatory regime that contains various levels of FDA oversight for medical devices "depending on the risks they present." 552 U.S. 312, 316-17 (2008). As the <u>Riegel</u> Court observed, the regulatory structure has three "Classes" of medical devices. <u>Id.</u> Class I, for example, is subject to the least oversight and includes devices such as elastic bandages and examination gloves. <u>Id.</u> Class III devices, at the other end of the spectrum, are subject to the most federal oversight, and this category includes medical devices such as replacement heart valves, implanted cereballa stimulators, and pacemaker pulse generators. <u>Id.</u> ***It is undisputed that the GraftMaster is a Class III medical device.***

Importantly for present purposes, the MDA contains an express preemption provision which, as interpreted by <u>Reigel</u>, operates to preempt "state law claims challenging the safety and effectiveness of ***a Class III medical device*** that had received pre-market approval from the FDA." <u>Weber v. Allergan, Inc.</u>, 940 F.3d 1106, 1111 (9th Cir. 2019) (citation omitted and emphasis added). Indeed, the MDA preempts state laws to the extent that they impose standards on Class III medical

devices "different from, or in addition to," FDA pre-market approval requirements.
Id. (citation omitted).

That said, the MDA *does not* prevent "a State from providing a damages remedy for claims premised on a violation of FDA regulations; the state duties in such a case '***parallel***,' rather than add to, federal requirements." Plourde v. Sorin Grp. United States, 517 F. Supp. 3d 76, 87 (D. Mass. 2021) (citations omitted and emphasis added). Otherwise stated, there is a "narrow gap through which a plaintiff's state-law claim must fit if it is to escape express or implied preemption." In re Medtronic, Inc., Sprint Fidelis Leads Prods. Liab. Litig., 623 F.3d 1200, 1204 (8th Cir. 2010) (citation omitted).

Judge Hillman, who presided over this matter before it was transferred to the undersigned, allowed Plaintiff a chance to enter this "narrow gap" at the motion to dismiss stage. See, *infra* (Procedural History). After a discussion of MDA preemption, the Court determined that "[w]ith respect to a manufacturing defect, the plaintiff has adequately pled a plausible ***parallel*** claim" and allowed Plaintiff to amend his complaint accordingly. [ECF No. 38 at 3–4 (citation omitted)].

### c.  Plaintiff Did Not Disclose Any Expert Witness(es)

It is undisputed that Plaintiff did not disclose an expert in this case. [ECF No. 92-1 at 2–3]. Whereas Defendant maintains that the failure to disclose experts as to the alleged manufacturing defect and the alleged causation is automatically fatal to Count I such that summary judgment must enter in its favor, [see, e.g., ECF No. 66 at 7], Plaintiff sees things differently. He has argued, in part, that "[a]n ***everyday***

8

***person can understand*** that the failure of a balloon to retract is a failure of a product to perform as intended." [ECF No. 92-1 at 9 (emphasis added)]. The Court resolves this legal issue below, but for now, the Court notes that it is undisputed that Plaintiff disclosed no expert witnesses in this case.

### d. Procedural History

Plaintiff originally filed this case in Massachusetts Superior Court. [ECF No. 1-1]. Defendant removed on diversity grounds, [ECF No. 1], and later moved to dismiss Plaintiff's claims under Fed. R. Civ. P. 12(6)(6), [ECF No. 10].  In response to this motion, another Session of this Court (J. Hillman) issued an order that highlighted certain issues with Plaintiff's original complaint and allowed him to amend subject to certain conditions. [ECF No. 25]. Plaintiff's Amended Complaint — which is the operative complaint in this case — purported to name three defendants[8] but alleged the following causes of action against Defendant, specifically:

| Count # | Cause of Action | Arising Under |
|:---:|:---:|:---:|
| I | Negligence | Massachusetts Law |
| II | Breach of Implied Warranty | Massachusetts Law |
| III | Breach of Express Warranty | Massachusetts Law |

---

[8] The first page of the Amended Complaint that was filed with the Court purported to name Dr. Harold Moore (one of the doctors involved in Plaintiff's surgery) and a corporate entity known to be associated with St. Vincent's, VHS Acquisition Subsidiary Number 7, Inc. [ECF No. 26-2 at 1]. Judge Hillman explained that apparently Plaintiff served a different version of the amended complaint with certain parties. [ECF No. 38 at 3]. In any event, Judge Hillman rejected Plaintiff's proposal to add new defendants. [ECF No. 38 at 7–10]. Accordingly, Abbott Vascular is the sole defendant in the case.

[ECF No. 26-2 at 6–8].

Judge Hillman granted in part and denied in part Defendant's motion to dismiss. [ECF No. 38]. Specifically, the Court dismissed Count II and Count III and narrowed Plaintiff's negligence claim (Count I) such that he could only proceed on a manufacturing defect theory. [See id. at 5–7].

Following discovery, Defendant filed the instant motion for summary judgment [ECF No. 66]. Plaintiff opposed, [ECF No. 92] and, with leave of Court, Defendant replied, [ECF No. 94]. By electronic order, this Court **GRANTED** Defendant's summary judgment motion. This opinion contains the Court's factual findings, legal analysis and reasoning for entering summary judgment in favor of Defendant.

### e. <u>This Court's Jurisdiction and the Applicable Substantive Law</u>

"Federal courts 'have an independent obligation to determine whether subject-matter jurisdiction exists, even when no party challenges it.'" <u>Industria Lechera De P.R. v. Beiró</u>, 989 F.3d 116, 120 (1st Cir. 2021) (citations omitted). While neither party has raised this issue, the Court will briefly recite why it has subject matter jurisdiction over Plaintiff's sole remaining state law claim. This Court has diversity jurisdiction over the claim under 28 U.S.C. § 1332. Plaintiff is a Massachusetts resident, and Defendant is a Delaware Corporation with its principal office in California, so the diversity of citizenship element is satisfied. <u>See</u> § 28 U.S.C. 1332(a)(1); [ECF No. 1 at 2, 5].

Further, the amount-in-controversy requirement is satisfied because, among other things, Plaintiff claimed that hospital and medical expenses and damages alone were worth $95,000 on his original[9] state court complaint's civil cover sheet, [ECF No. 1-3 at 11], and because he has alleged serious injuries resulting from a complex surgery as well as, among other things, "suffered anguish of mind." See § 28 U.S.C. 1332(b); Cole v. Medtronic, Inc., No. 3:14-cv-381-DJH, 2015 U.S. Dist. LEXIS 48099, at *8–9 (W.D. Ky. Apr. 13, 2015) (explaining that "the Court is confident that the case involves more than $75,000" where the alleged injuries (complications of spine surgery that possibly required further surgery to repair), "are by nature serious, complex, and expensive to treat"). Accordingly, the Court is satisfied that it has diversity jurisdiction over the case. Further, the undersigned finds that no party has challenged this Court's personal jurisdiction over them, and that venue is proper in this judicial district.

In terms of substantive law, it is common ground that Massachusetts supplies the substantive rules of decision in this diversity suit, including as to the elements of Plaintiff's Count I claim, as well as the related question of whether expert evidence is required to prove up that claim. See, e.g., Sanders v. Phoenix Ins. Co., 843

---

[9] Although Judge Hillman narrowed the case at the motion to dismiss stage, the undersigned is mindful that "[d]iversity jurisdiction is determined at the time the action commences, and a federal court is not divested of jurisdiction if . . . the amount in controversy subsequently drops below the minimum jurisdictional level." Sherwin v. Infinity Auto Ins. Co., 639 F. App'x 466, 467 n.1 (9th Cir. 2016) (unpublished) (citation omitted).

F.3d 37, 42 (1st Cir. 2016); King v. Pierce Mfg., 608 Fed. Appx. 18, 19 (1st Cir. 2015) (unpublished) ("In a diversity action such as this one, 'whether expert testimony is required is a matter of state law.'") (citation omitted).

### III.   <u>Summary Judgment Standard</u>

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" when a reasonable factfinder could resolve it in favor of the nonmoving party. <u>Morris v. Gov't Dev. Bank</u>, 27 F.3d 746, 748 (1st Cir. 1994). A fact is "material" when it may affect the outcome of the suit. <u>Id.</u>

At the summary judgment stage, the Court must view the record in the light most favorable to the non-moving party and must "indulge all reasonable inferences" in their favor. <u>Martins v. Vt. Mut. Ins. Co.</u>, 662 F. Supp. 3d 55, 64 (D. Mass. 2023) (citing <u>O'Connor v. Steeves</u>, 994 F.2d 905, 907 (1st Cir. 1993)). In the first instance, the moving party "bears the burden of demonstrating the absence of a genuine issue of material fact." <u>Carmona v. Toledo</u>, 215 F.3d 124, 132 (1st Cir. 2000) (citations omitted). If a properly supported summary judgment motion is presented, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial," and may not simply "rest upon mere allegation or denials of [their] pleading," but must instead "present affirmative evidence." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250, 256–57 (1986). "If, after viewing the record in

the non-moving party's favor, the Court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate." Walsh v. Town of Lakeville, 431 F. Supp. 2d 134, 143 (D. Mass. 2006).

"Neither party may rely on conclusory allegations or unsubstantiated denials, but must identify specific facts derived from the pleadings, depositions, answers to interrogatories, admissions and affidavits to demonstrate either the existence or absence of an issue of fact." Magee v. United States, 121 F.3d 1, 3 (1st Cir. 1997).

## IV.    Count I: Negligence (Manufacturing Defect Theory)

### a.    Legal Landscape

#### i.    In General

As the Supreme Judicial Court has explained, the "basic elements of a products liability action founded on negligence are duty, breach of duty, cause in fact, and proximate cause." Colter v. Barber-Greene Co., 403 Mass. 50, 61 (1988). Liability lies in this context when "a product's manufacturer or seller has failed to use reasonable care to eliminate foreseeable dangers which subject a user to an unreasonable risk of injury." Id. A manufacturing defect is one that "may cause a product to be defective or unreasonably dangerous." Bell v. Covidien LP, No. 22-11465-FDS, 2023 U.S. Dist. LEXIS 68235, at *11 (D. Mass. Apr. 19, 2023) (citation omitted). A manufacturing defect occurs when "a product differs from identical products issued from the same manufacturer." Wasylow v. Glock, Inc., 975 F. Supp. 370, 377 (D. Mass. 1996) (citation omitted).

To prove a manufacturing defect, "a plaintiff must demonstrate that there is a 'deviation from the design [that] rendered the product unreasonably dangerous and therefore unfit for its ordinary purposes.'" Burnham v. Wyeth Labs. Inc., 348 F. Supp. 3d 109, 112 (D. Mass. 2018) (quoting Back v. Wickes Corp., 375 Mass. 633, 641 (1978). Indeed, plaintiffs bear "the burden of proving that a defect attributable to the manufacturer's negligence caused the injury." Corsetti v. Stone Co., 396 Mass. 1, 23 (1985) (citations omitted). And, in cases where "the accident occurs after the defendant has surrendered control of the instrumentality involved, it is incumbent upon the plaintiff to show that the instrumentality had not been improperly handled by himself or by intermediate handlers." Id. at 24 (citation and internal quotation marks omitted). Said differently, "[b]ecause the defect is alleged to have been caused by a manufacturing error affecting only one particular product, to show that the defect is attributable to the manufacturer, **the plaintiff must show that it was not caused by intermediaries.**" Smith v. Ariens Co., 375 Mass. 620, 626–27 (1978) (emphasis added).

### ii.  Is Expert Evidence Required?

Expert evidence *is* required in the context of manufacturing defect claims *when* the nature of the alleged defect is complex enough such that it is outside the scope of lay knowledge. As the First Circuit has explained while interpreting Massachusetts law, "expert testimony ***may not*** be required in cases where the jury can find a design or manufacturing defect based on the testimony of the injured or of co-workers," however, expert testimony ***is required*** when the "nature of the defect or breach of

warranty and its causal relation to the accident [are] ***complex*** . . . .” Hochen v. Bobst

Grp., Inc., 290 F.3d 446, 451 (1st Cir. 2002) (citation omitted and emphasis added).

This rule makes good sense given that certain products are sufficiently complex

such that their manufacturing process -- and issues of causation, for that matter --

are outside the scope of general, lay knowledge. Thus, presenting certain

manufacturing defect cases to a jury in the absence of expert evidence would put

jurors in the unacceptable position of having to merely conduct guesswork. Cf. King,

608 Fed. Appx. at 19–20 (explaining in the related context of negligent design and

breach of warranty claims that “testimony is required in complex product liability

cases in order to mitigate against jury ‘conjecture and surmise’ regarding the cause

of the injuries at issue and the relevant standard of care”) (citations omitted).

In the context of manufacturing defect claims, another Session of this Court

has concluded that expert testimony was not necessary to prove that ***a sandal*** had

a manufacturing defect, see Hofer v. The Gap, Inc., 516 F. Supp. 2d 161, 173 n.13 (D.

Mass. 2007), whereas the Massachusetts Appeals Court has ruled that expert

evidence was required to prove a manufacturing defect in a ***1964 Pontiac***

***windshield***, see, e.g., Wiska v. St. Stanislaus Soc. Club, Inc., 7 Mass. App. Ct. 813,

821 (1979) (“Since this was not a case in which the jury could find of their own lay

knowledge that there existed a design defect in the 1964 Pontiac windshield exposing

users to an unreasonable risk of injury[], the ***plaintiffs’ failure to adduce expert***

***testimony*** on the issues of design negligence or failure to warn on the part of GMC

***was fatal to their case.***”) (emphasis added).

In the context of medical device cases, specifically, two decisions from this Court are instructive. In <u>Laspesa v. Arrow International, Inc.</u>, another Session considered whether expert evidence was required in a case involving a manufacturing defect claim related to an ***epidural catheter*** and found that:

> Without a base of knowledge regarding catheters in general and the Arrow catheter in particular, the jury would need to hear testimony regarding the proper functioning of this catheter and the likelihood that it would break in order to find a manufacturing defect in the catheter at issue in this case. ***In the absence of such testimony, it is impossible for the jury to determine that the catheter deviated from its intended design***.

<u>Laspesa v. Arrow Int'l, Inc.</u>, No. 07cv12370-NG, 2009 U.S. Dist. LEXIS 121576, at *17–18 (D. Mass. Dec. 23, 2009) (emphasis added). Similarly, in <u>Hunt</u>, another Session of this Court determined that expert evidence was required to prove a manufacturing defect theory claim relating to a ***FDA Class I*** and an ***FDA Class II*** product.[10] <u>Hunt v. Covidien LP</u>, No. 22-10697-RGS, 2024 U.S. Dist. LEXIS 94280, at *24 (D. Mass. May 28, 2024) ("Hunt retained [an expert witness] to testify that the [Class I and Class II] Products were defectively manufactured and [another expert witness] to testify that the Products' warnings were deficient. The court has found both opinions inadmissible, and Hunt offers no other expert testimony for the claims, so they are dismissed.").

Out-of-state and out-of-circuit authority is in accord with this general approach. <u>See, e.g.</u>, <u>Iverson v. Smith & Nephew, Inc.</u>, No. 15-cv-219-jdp, 2016 U.S.

---

[10] As a reminder, FDA Class I and FDA Class II medical devices are subject to less regulatory scrutiny that FDA Class III devices, like the GraftMaster.

Dist. LEXIS 100141, at *3 (W.D. Wis. Aug. 1, 2016) (concluding in a case that included a manufacturing defect claim that, "[t]his case involves complex issues about a medical device that are well outside the knowledge or experience of a lay person. To succeed on their claims that the BHR implant was defective, under state or federal law, the Iversons would need expert testimony"); <u>Hughes v. Stryker Sales Corp.</u>, No. 08-0655-WS-N, 2010 U.S. Dist. LEXIS 64439, at *4 (S.D. Ala. June 28, 2010) ("The interaction between a complex and technical medical device and the unique physiological and medical circumstances of the patient in which it is implanted ***is a subject on which no ordinary juror could rationally be expected to have knowledge***. The net result is that, without the benefit of expert testimony, a reasonable jury could not possibly make a determination on this summary judgment record that Hughes' injuries were caused by a manufacturing or design defect in the prosthetic hip.").

### b.  <u>Application</u>

The Court will now apply the law as described *supra* to the facts of this case, starting with the threshold question of whether Plaintiff is required to offer expert evidence to support his Count I manufacturing defect claim.

### i.  <u>Was Plaintiff Required to Disclose an Expert?</u>

Yes.  Under Massachusetts law, determining whether an expert is required in a manufacturing defect case "is a factual inquiry that examines the nature and circumstances of the alleged defects."  <u>Berezin v. FCA US, LLC</u>, No. 21-10852-FDS, 2023 U.S. Dist. LEXIS 213030, at *9 (D. Mass. Nov. 30, 2023) (citation omitted).  The

Court will not belabor the obvious point that an alleged manufacturing defect in the GraftMaster, whose undisputed form and function is immediately described below, would be far outside of potential jurors' "own lay knowledge."[11]

> The GraftMaster is made up of an ultra-thin layer of expandable polytetrafluoroethylene (PTFE), sandwiched between two GraftMaster expandable stents. To treat [a coronary] perforation, the deploying physician passes a wire through the artery to the site of the perforation, deploys the GraftMaster over that wire to the location of the perforation, and then expands the GraftMaster stent system with the aid of a balloon which allows the stent to cover the perforation and stop the bleeding.

[ECF No. 66 at 3].

The Court's decision that expert evidence is required in this case is therefore squarely in line with Laspesa, described *supra*, in which another Session of this Court found that expert evidence was required to prove up a manufacturing defect claim involving epidural catheters. See 2009 U.S. Dist. LEXIS 121576, at *18 ("In the absence of such testimony, it is impossible for the jury to determine that the catheter deviated from its intended design."). The Court's determination is also informed by reference to Hunt, whereby another Session of this Court found that expert evidence was required relative to a manufacturing defect claim involving FDA Class I and FDA Class II medical devices. See Hunt, 2024 U.S. Dist. LEXIS 94280, at *24. Given that FDA Class III Devices, like the GraftMaster, are subject to even more regulatory scrutiny, it seems to follow that they can fairly be considered even more complex for purposes of deciding whether expert evidence is necessary in manufacturing defect

---

[11] See Wiska, 7 Mass. App. Ct. at 821.

cases.  Cf. Manopella-Fletcher v. Bayer, Inc., No. 22-CV-0693, 2022 U.S. Dist. LEXIS 195084, at *3 (E.D.N.Y. Oct. 26, 2022) ("As a number of courts have held, Essure [a permanent contraceptive device] belongs to ***the small category of complex and innovative*** Class III devices that the FDA comprehensively and exclusively regulates through its 'rigorous' pre-market approval process.") (emphasis added; citations omitted).  Said differently, if the relatively less complex and innovative Class I and Class II products in Hunt required expert evidence, it is hard to see how the Class III device at issue here would not.

Plaintiff argues that the alleged defect and the alleged causation are within the ambit of jury's common understanding.  [See, e.g., ECF No. 92-1 at 9 (Plaintiff arguing that, "[a]n everyday person can understand that the failure of a balloon to retract is a failure of a product to perform as intended").  The only evidence that Plaintiff provides to support his manufacturing defect claim is his treating physician's testimony that he had never before encountered the issue of the GraftMaster becoming lodged in a patient's body and then being unable to remove it. See [ECF Nos. 92 at 13–14; 66 at 9–11; ECF No. 68-6 at 25; ECF No. 68-8 at 21].  Plaintiff simply cannot prove his manufacturing defect case regarding the GraftMaster with merely this and other related evidence.  Accordingly, this Court finds that expert testimony ***is required*** in this case because the "nature of the defect . . . and its causal relation to the accident [are] ***complex*** . . . ."  See Hochen, 290 F.3d at 451 (citation omitted and emphasis added).  Summary judgment must enter in favor of Defendant on this basis alone.  Therefore, the Court need not reach the

remainder of Plaintiff's argument. However, for the sake of completeness, the Court next reviews Plaintiff's invocation of *res ipsa loquitur*.

### c. The *Res Ipsa Loquitur* Issue

In his opposition to Defendant's summary judgment motion, Plaintiff has advanced, for the first time, a new theory for recovery under *res ipsa loquitur*.[12] [ECF No. 92 at 13]. The Court rejects this attempt to pursue this new theory at the eleventh hour for three independently sufficient reasons. First, it is not at all within the narrow gateway that Judge Hillman left open for Plaintiff in the Court's order at the motion to dismiss stage, so it foreclosed on that basis. [ECF No. 38 at 7 (Judge Hillman stating that, "[i]n sum, the plaintiff may proceed on a manufacturing defect theory…")]. Second, allowing Plaintiff to introduce this new theory of recovery at this point and in this fashion would run afoul of the general and firmly established principle that plaintiffs cannot advance new theories of recovery in an opposition to summary judgment motions, given fairness and timeliness concerns, among others. See, e.g., Layton v. Deutsche Inv. Manage-Ment Ams., Inc., No. 04-10500-EFH, 2006 U.S. Dist. LEXIS 106294, at *2 n.2 (D. Mass. May 11, 2006) ("Plaintiff has advanced new theories of recovery -- theories not included in his Complaint -- in his response to defendant's Motion for Summary Judgment. These arguments need not be considered by this Court because '[i]t is well-settled that plaintiffs are generally not

---

[12] Plaintiff also attempts to revive his breach of warranty claims, but Plaintiff's breach warranty claims were dismissed by Judge Hillman at the motion to dismiss stage. [See ECF No. 38 at 7]. Any attempt to re-raise these issues is therefore denied.

permitted to raise brand new theories of their case in opposition to a motion for summary judgment.'") (citation omitted).  So, the Plaintiff's attempt fails in light of that principle.  Third and finally, this Court finds that it would have been extremely difficult if not impossible to prove a negligent defect relative to an FDA Class III device like the GraftMaster with just a *res ipsa* theory.  <u>See e.g.</u>, <u>Weber</u>, 940 F.3d at 1112 (considering manufacturing defect claims involving FDA Class III devices and explaining that to survive MDA preemption, a plaintiff cannot simply demonstrate a defect or a malfunction and rely "on *res ipsa loquitur* to suggest only . . . 'that the thing speaks for itself'") (emphasis added); <u>cf.</u> <u>Clark v. Medtronic, Inc.</u>, 572 F. Supp. 2d 1090, 1094–1095 (D. Minn. 2008) (granting summary judgment in favor of a medical device manufacturer defendant where plaintiff's *res ipsa* argument was that an FDA Class III device would not have caused the alleged harm had it been manufactured in compliance with federal regulations and observing that the device was "complex" and thus not akin to "a barrel falling from a second-story warehouse door" where a *res ipsa* claim might be more appropriate).

## V.    <u>CONCLUSION</u>

For the forgoing reasons, Defendant's motion to for summary judgment is **<u>GRANTED</u>**.

**SO ORDERED.**

Dated: March 31, 2025

/s/ Margaret R. Guzman
Margaret R. Guzman
United States District Judge
